**VEDDER PRICE P.C.**
Thomas R. Dee (*Pro Hac Vice* forthcoming)
tdee@vedderprice.com
222 North LaSalle Street
Chicago, Illinois 60601
T:  +1 312 609 7500
F:  +1 312 609 5005

**VEDDER PRICE (CA), LLP**
Deborah A. Hedley, Bar No. 276826
dhedley@vedderprice.com
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T:  +1 424 204 7700
F:  +1 424 204 7702

Attorneys for Plaintiff
BAKEMARK USA, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BAKEMARK USA, LLC, a Delaware LLC, <br><br> Plaintiff, <br><br> v. <br><br> JAVIER NAVARRO, an individual, JEFFREY KLEIN, an individual, ROY BAHNER, an individual, GARY HARDGROVE, an individual, CAPITOL DISTRIBUTION COMPANY, LLC d/b/a CAPITOL FOOD CO., a California limited liability company, SUNRISE FOOD SERVICE, INC., a California corporation, and DOES 1 through 50, inclusive. <br><br> Defendants. | Case No. 2:21-cv-2499 <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES:** <br><br> **1.  VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836;** <br> **2. BREACH OF CONTRACT;** <br> **3.  BREACH OF DUTY OF LOYALTY;** <br> **4.  BREACH OF FIDUCIARY DUTY;** <br> **5.  UNFAIR COMPETITION under CAL. BUS. & PROF. CODE §§ 17200 et seq.** <br> **6.   VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030;** <br> **7. VIOLATION OF CALIFORNIA PENAL CODE §502;** <br> **8. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS.** <br><br> JURY TRIAL DEMANDED |

Plaintiff BakeMark USA, LLC ("<u>BakeMark</u>") or ("<u>Plaintiff</u>"), as and for its Complaint Against Defendants Javier Navarro ("<u>Navarro</u>"), Jeffrey Klein ("<u>Klein</u>"), Roy Bahner ("<u>Bahner</u>"), Gary Hardgrove ("<u>Hardgrove</u>"), Capitol Distribution Company, LLC d/b/a Capitol Food, Co., ("<u>Capitol</u>"), Sunrise Food Service ("Sunrise") and DOES 1 through 50, inclusive, (collectively, with Navarro, Klein, Bahner, Hardgrove, Capitol, and Sunrise, the "<u>Defendants</u>"), states as follows:

## INTRODUCTION

1.     BakeMark is an industry-leading bakery supply company which has operated for nearly 100 years.  As a manufacturer and distributor with 25 branches located across the U.S. and Canada, BakeMark delivers a complete line of bakery mixes, fillings & icings, glazes, donut sugar and frozen goods to bakeries and food service companies across the nation.  BakeMark provides flour, sugar, shortening, dairy & eggs, packaging & supplies and gourmet chocolate through its exclusive brands: Westco, Trigal Dorado, Best Brands, BakeSense, BakeQwik, Multifoods, C'est Vivant and Sprinkelina.

2.     BakeMark's secret recipes are the lynchpin of its enduring success. BakeMark fiercely guards against disclosure of these recipes to its competition. These recipes include proprietary donut mixes, bakery mixes, fillings & icings, glazes, donut sugar and frozen goods that are the result of BakeMark's extensive and expensive investment in being a leader and innovator in the quality bakery product space.  While BakeMark may not be a household name, many readers will have tasted one of its confections in a local bakery.

3.     BakeMark also owns a variety of other proprietary information related to its expertise in manufacturing, distribution, research & development and in providing technical and marketing support to bakeries across the United States.

4.     BakeMark has recently discovered that it is under attack both from within its own ranks, and from outside competition. In recent days, BakeMark has discovered that three current high-level employees, Navarro, Klein and Bahner, have

been working *against* BakeMark in cahoots with competitor, Capitol Foods Co. and its current employee, Gary Hardgrove, a former high-level BakeMark employee, as well as with a distribution company working in conjunction with Capitol, Sunrise Food Service.

5.     These Defendants have engaged in multiple unlawful acts, including stealing BakeMark's trade secrets, soliciting coworkers while employed by BakeMark, plotting to compete with BakeMark while employed by BakeMark, and upon information and belief, illegally bypassing system safeguards to access BakeMark's protected computer systems, among other acts.

6.     BakeMark brings this Complaint to thwart any future harm to its business and operations that these rogue employees and competitors may seek to inflict upon BakeMark through their unlawful behavior.

## THE PARTIES

7.     BakeMark is a Delaware corporation with its principal place of business located in Pico Rivera, California.

8.     Javier Navarro is an individual who is, upon information and belief, a resident of the County of Los Angeles, California.

9.     Jeffrey Klein is an individual who is, upon information and belief, a resident of the County of San Diego, California.

10.     Roy Bahner is an individual who is, upon information and belief, a resident of the County of Orange, California.

11.     Gary Hardgrove is an individual who is, upon information and belief, a resident of the County of Orange, California.

12.     Capitol Distribution Company, LLC d/b/a Capitol Food, Co., is a California limited liability company, with its principal place of business in Cerritos, California.

13.     Sunrise Food Service is a California corporation with its principal place of business in Vernon, California.

14.     The true names or capacities, whether individual, corporate, associate or otherwise, of defendants sued as Does 1 through 50 are currently unknown to BakeMark, who therefore sues such Defendants under fictitious names.  BakeMark is informed and believes and thereon alleges that each Defendant herein designated as a Doe is responsible in some manner for the events and happenings referred to herein, including but not limited to entities that are owned, operated or controlled by Defendants, and, accordingly, BakeMark will amend this Complaint to show their true names and capacities when the same have been ascertained.

15.     BakeMark is informed and believes and thereon alleges that at all times mentioned herein, all of the Defendants acted in concert with the other Defendants named in this Complaint in the wrongful and improper activities alleged and, therefore, are responsible for the damages suffered by BakeMark as alleged and for the other legal consequences of the wrongful activity alleged herein, and/or have an interest or claimed interest in the subject matter of this action. BakeMark is further informed and believes that at all times mentioned herein, each Defendant named in this Complaint was the agent and/or employee of each of the remaining Defendants, and acted in concert for the purpose of injuring BakeMark as alleged herein.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1836 and 28 U.S.C. § 1331 because the Defend Trade Secrets Act and the Computer Fraud and Abuse Act present federal questions.

17.     The Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same case or controversy.

18.     This Court has personal jurisdiction over all Defendants because they are citizens of California.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## FACTUAL BACKGROUND

### -BakeMark's Business-

20.    BakeMark was founded in 1929. Since that time, it has grown to be a nationwide leader in the bakery supply industry.

21.    With almost 100 years of service to the baking industry, BakeMark is engaged in the highly-competitive business of manufacturing and supplying quality bakery products, ingredients, and supplies, including bakery mixes, fillings, icings, glazes, donut sugar, frozen varieties, flour, sugar, shortening, dairy, eggs, and gourmet chocolate through its exclusive brands: Westco, C'est Vivant, Trigal Dorado, BakeQwik, BakeSense, Multifoods and Margerite. BakeMark operates a union shop with Teamsters 848 and 630, 853 and 70 in Pico Rivera and Union City, California.

### -BakeMark's Trade Secrets-

22.    The nature of BakeMark's business generates a wealth of proprietary information, as all of the products and services BakeMark provides require reliance on proprietary recipes, formulas, processes, techniques, product listings, customer lists, pricing, and specifications developed by BakeMark over the last hundred years of its operations (the "BakeMark Trade Secrets").

23.    Indeed, the recipes (including every item that can be used in bakery or donut shop, which total over 7,000 different items) BakeMark developed are all highly-guarded trade secrets.  Of particular importance to this case are a sub-category of BakeMark's Trade Secrets, its trade secret donut mixes and icing products, including its trade secret formulas entitled "Master Mix," "Super Roll" and "Super Speedee" and its entire donut mix line, including formulas for its Raise, Cake, Blueberry, Chocolate, Red Velvet, French Cruller, Buttermilk, Old Fashioned, and Vegan mixes (the "BakeMark Donut Line").

24.    BakeMark has spent years developing these recipes, and has a dedicated research and development department with a $2.2 million annual spend, which

devotes approximately 12,000 hours of manpower a year towards engineering recipes and formulas that will continue to give BakeMark its competitive edge.

25.  BakeMark goes to great lengths to protect this information, including, but not limited to:

- Requiring all BakeMark employees to sign confidentiality agreements. These agreements make clear that the information employees are exposed to throughout their employment are confidential and are the sole property of BakeMark. Employees are expressly forbidden from disclosing BakeMark's information to anyone outside of BakeMark or from using BakeMark's information for any non-BakeMark business. BakeMark regularly requires its employees to sign confidentiality agreements;

- Keeping all of BakeMark's trade secret recipes and formula on locked-down servers and systems to which access is restricted. Indeed, permission to access the portions of these systems/servers on which the recipes and formulas are housed may only be granted by certain C-Suite level employees;

- Requiring all visitors to sign non-disclosure agreements;

- Forbidding any cameras in BakeMark's facilities; and

- Allowing only high-level employees, Procurement Director level and above, and research & development employees control access to recipes and formulas ("BakeMark's Efforts to Protect Trade Secrets").

**- Wayward Employees/Former Employees Hold High-Ranking Positions at BakeMark's Pico Rivera HQ-**

26.  BakeMark is headquartered in Pico Rivera, California. This is BakeMark's largest facility and houses Manufacturing, Distribution, as well as the company's Corporate Headquarters, including Finance, Human Resources, Administration, Accounting, and Marketing departments.

27.     Indeed, the company's brain trust and the majority of its executive, managerial, high-level employees, including Navarro, Klein and Bahner are based in this location.

28.     Each of Navarro, Klein and Bahner are longstanding and high-ranking BakeMark employees.

29.     Klein is a Director of Sales, and was hired in 2016.  He has responsibility over BakeMark's entire sales force which includes 3 Key Account Managers, 4 District Sales Managers, 45 Sales Representatives and 4 Inside Sales Reps. The span of Klein's control is $240 million in sales and 4,000 customers, and hundreds of vendors/suppliers including customers in Hawaii, Mexico and other Latin America countries. Klein is additionally tasked with: (1) working in conjunction with other members of the Branch management group to develop the Branch Business Plan, including budget target strategies and action plans; (2) recommending changes in structure and organization of sales group to ensure effective fulfillment of objectives assigned and to provide the flexibility to move swiftly in relation to market needs and opportunities; (3) executing sales plans within the sales force, working through appropriate personnel; (4) managing the Branch retail and wholesale pricing strategy that will result in the optimal profitability and market share in all of the company's product lines; (5) determining staff requirements, territory planning and territory realignments; (6) recruiting, hiring, training, and developing sales representatives; (7) conducting performance evaluations and goal measurements of all sales personnel; and (8) working with R&D to develop new items and or flavor profiles to sell in the market.

30.     Navarro is a District Sales Manager/Sales Manager, and was hired in August 2012. He is tasked with: (1) working in conjunction with other members of the Branch management group to develop the Branch Business Plan, including budget target strategies and action plans; (2) recommending changes in structure and organization of sales group to ensure effective fulfillment of objectives assigned and

to provide the flexibility to move swiftly in relation to market needs and opportunities; (3) executing sales plans within the sales force, working through appropriate personnel; (4) managing the Branch retail and wholesale pricing strategy that will result in the optimal profitability and market share in all of the company's product lines; (6) determining staff requirements, territory planning and territory realignments; (7) recruiting, hiring, training and developing sales representatives; (8) completing  performance evaluations and goal measurements of all sales personnel; and (9) working with R&D to develop new items and or flavor profiles to sell in the market.   Navarro currently manages a team of nine sales representatives.

31.     Bahner is a District Sales Manager/Sales Manager and was hired in 2008. He is tasked with: (1) working in conjunction with other members of the Branch management group to develop the Branch Business Plan, including budget target strategies and action plans; (2) recommending changes in structure and organization of sales group to ensure effective fulfillment of objectives assigned and to provide the flexibility to move swiftly in relation to market needs and opportunities; (3) executing sales plans within the sales force, working through appropriate personnel; (4) managing the Branch retail and wholesale pricing strategy that will result in the optimal profitability and market share in all of the company's product lines; (6) determining staff requirements, territory planning and territory realignments; (7) recruiting, hiring, training and developing sales representatives; (8) completing  performance evaluations and goal measurements of all sales personnel; and (9) working with R&D to develop new items and or flavor profiles to sell in the market.  Bahner currently manages a team of eight sales representatives.

32.     Hardgrove worked for BakeMark in its Pico Rivera HQ from 2003 to 2009, in the role of Purchasing Director.  As the Purchasing Director, Hardgrove worked in the purchasing department(s) and overall facilities of BakeMark, and was in part, responsible for reviewing purchasing processes, directing and coordinating

activities of all purchasing activity, and working with commodities, branch personnel, suppliers, and others within the organization.

33.    In each employee's role, he gained significant training and knowledge and expertise in specific areas related to BakeMark's business of manufacturing and marketing ready-to-use icings, fillings, mixes and bases, frozen dough and batters, donut glazes, icing bases, icing and glaze stabilizers, cake frosting and related products which training, knowledge and expertise each employee would not have otherwise obtained.

**-The Employees' Non-Solicitation, Inventions & Confidentiality Agreements-**

34.    Each of Navarro, Klein, and Bahner signed a non-disclosure agreement upon their initial employment with BakeMark, and periodically signed updated agreements throughout their tenure. A true and correct copy of Navarro's Employee Non-Solicitation, Inventions & Confidentiality Agreement, dated February 18, 2021, is attached hereto as **Exhibit A**. A true and correct copy of Klein's Employee Non-Solicitation, Inventions & Confidentiality Agreement, dated February 24, 2021, is attached hereto as **Exhibit B**. A true and correct copy of Bahner's Employee Non-Solicitation, Inventions & Confidentiality Agreement, dated February 19, 2021, is attached hereto as **Exhibit C**. (Exhibits A-C, which are substantively identical, shall be referred to as the "Agreements" for ease of reference.)

35.    The Agreements specify that "through Employee's employment with the Company, Employee will be placed in a position of trust and confidence with the Company and that the Company will provide (or has provided) Employee with confidential and proprietary information concerning its business, products, suppliers, manufacturers, pricing, customers, and employees, and will entrust Employee with business relationships and good will of great value to the Company."

36.    Provision 4 of the Agreements specifies:

> Employee shall hold Confidential Information (as defined below) in the strictest confidence and shall not, without the prior written authorization

of an authorized the Company officer, or as required by law, disclose Confidential Information in any manner to any person, or use Confidential Information in any way, other than in the furtherance of Employee's duties during his/her employment with the Company. The foregoing obligation shall apply at all times during employment with the Company and for a period of five (5) years thereafter, unless such information qualifies as a trade secret, in which case the foregoing obligation shall continue for so long as the trade secret remains protected under applicable law. Employee will not copy, duplicate or reproduce Confidential Information for any purpose other than for use by or on behalf of the Company and will not improperly take or retain such information without the Company's prior written consent. Employee will comply with all Company policies, procedures and practices pertaining to such Confidential Information and take all commercially reasonable steps to protect and maintain the secrecy thereof.

(a) "Confidential Information," as used herein, means trade secrets (as defined by applicable law) or other confidential and proprietary information relating to the Company's customers, manufacturing, products, services, pricing and sales, research, business, practices, procedures or Baking Products not generally known by or available to the public that Employee becomes privy to by virtue of employment with the Company, including but not limited to the following:

(i) collected or compiled information about the Company's customers, including names, addresses, telephone numbers, contact persons and other identifying information with respect to the needs and requirements for customers; information dealing with the nature of customers' accounts, including the dates on which agreements between the Company and such customers will end and/or be subject to renewal; and rate and price information and history relating to products provided by the Company to its customers;

(ii) information about the Company's internal methods of operation and manufacturing, including information relating to the machinery, equipment, processes, product mix and formulas by which the Company develops and manufactures its Baking Products; and

(iii) information about the Company's sales, finances and business, including business and marketing plans, practices and strategies;

information with respect to the Company's suppliers and the availability of materials and supplies used in its business; and non-published financial information relating to the Company's income, budgeting, cost structures, expenses, profits and general financial standing.

37.     Provision 6 of the Agreements specifies:

Employee agrees that during employment with the Company and for a period of one (1) year after Termination, Employee will not directly or by assisting others: (a) solicit, call upon or contact any Restricted Customers (as defined below) for the purpose of providing products or services that are competitive with Baking Products and related services offered or provided by the Company within two (2) years prior to Termination ("Competitive Products or Services"); (b) contract with, sell to or perform services for or on behalf of any Restricted Customers in connection with Competitive Products or Services; or (c) divert, unlawfully interfere with, or attempt to divert or unlawfully interfere with, the Company's business relationship with any Restricted Customers. The term "Restricted Customers" means existing customers with whom the Company has conducted business within two (2) years prior to Termination and with whom during such time Employee had business-related contact or was privy to Confidential Information.

38.     Provision 7 of the Agreements specifies:

Employee agrees that during employment with the Company and for a period of one (1) year after Termination, Employee will not directly or by assisting others: (a) solicit, induce or encourage any Restricted Employees (as defined below) to terminate their employment or other association with the Company or to work for a Competing Business; or (b) hire, caused to be hired or attempt to hire any Restricted Employees on behalf of a Competing Business. The term "Restricted Employees" means each and every person employed or otherwise engaged by the Company, including independent contractors, within two (2) years prior to Termination and with whom during such time Employee had supervisory responsibility, work-related contact or was privy to personnel information relating to such persons' compensation, benefits, job duties or performance evaluations.

Notwithstanding the foregoing, "Restricted Employees" does not include persons who have not been employed or otherwise engaged by the Company for more than six (6) months at the time of any such

solicitation, inducement, encouragement, hiring or attempted hiring. The term "Competing Business" means any individual (including Employee), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is directly engaged in whole or in relevant part in any business or enterprise which is competitive with the business conducted by the Company, including the manufacturing, marketing and sale of Baking Products.

39.    Provision 11 of the Agreements specifies:

The parties recognize that the Company will suffer irreparable damage if Employee violates or threatens to violate the terms of Sections 4, 5, 6, 7 and 9, and that such damage would be difficult to quantify, and it is therefore agreed that, in the event of a breach or threatened breach of said Sections, the Company shall be entitled to injunctive relief, in addition to all other legal and equitable remedies available to it, without the necessity of posting a bond or other security. The prevailing party in any such action shall be entitled to recover its reasonable costs and attorneys' fees.

**- Navarro, Klein And Bahner Plot to Compete with BakeMark While Still Employed, Including by Soliciting Current Employees To Work for Competitor-**

40.    Each of Navarro, Klein and Bahner are longstanding, high-ranking managerial and/or director-level BakeMark employees.

41.    BakeMark has recently become aware that each of Navarro, Klein, and Bahner are soliciting other *current* employees, including those they supervise, to leave BakeMark and work for a competing business, Sunrise, along with Navarro, Klein and Bahner.

42.    Instead of working in BakeMark's best interests, Navarro, Klein and Bahner have actively been working to undermine BakeMark's success and destroy employee morale.  Egregiously, Navarro, Klein and/or Bahner have repeatedly denigrated BakeMark to sales representatives that they are seeking to recruit to Sunrise.

43.     Each of Navarro, Klein and/or Bahner have also sought to destroy their direct reports' and other sales representatives' loyalty to BakeMark, by telling their direct reports that BakeMark's territory and commission structure are nonsense which they would not have to endure at Sunrise.

44.     Each of Navarro, Klein and/or Bahner were employed to increase sales for BakeMark.  However, instead of fulfilling this core job function, they have each worked *to thwart* BakeMark from making sales to its customers.

45.     These employees have deliberately raised prices on BakeMark's products, including its trade secret recipe glaze product, Super Speedee, to price BakeMark out of the market.  Multiple customers have refused to accept these outrageous price increases, and the employees have refused to budge, causing BakeMark to lose customers.

46.      Specifically, during a recent promotional event Klein and Bahner increased the price on Super Speedee to subvert the company's desire to run a lower price promotion for customers.  Instead of selling the promotion at BakeMark's desired price of $28.75, Klein and Bahner issued directives to the sales force to sell the promotion at a minimum of $32.08, damaging the customers and BakeMark by $3.33 per bag as a result.  When leadership caught onto them, Klein and Bahner responded by directing their team to sell at increased prices.

47.     Further, Navarro, Klein and Bahner were tasked with hiring 10 new sales representatives to grow BakeMark's business even further in 10 newly created territories.  However, they have failed to complete this task, further undermining BakeMark's operations.

48.     Additionally, Bahner has used his work email address to convey his resume to his personal email address, doing personal activities on BakeMark's clock.

**-Navarro, Klein and Bahner Steal BakeMark's Information-**

49.     While plotting to unfairly compete with BakeMark, Navarro, Klein and Bahner have, upon information and belief, stolen the BakeMark Trade Secrets,

including the BakeMark Donut Line, product listings, customer lists, and pricing. Upon information and belief, the information taken also includes supplier information and specifications which would allow Capitol and Sunrise to order sufficient quantities and negotiate with suppliers based on these customer's historic uses and purchases of BakeMark's products. Defendants have, in short, stolen BakeMark's entire sales' playbook and BakeMark Donut Line to compete with BakeMark on sales of copycat products to BakeMark's current customers.

50.    Upon information and belief, Navarro, Klein and Bahner have stolen the recipes/formulas for BakeMark's Donut Line by accessing servers, systems, folders, and/or files to which BakeMark has not granted them access.

51.    Navarro, Klein and Bahner have emailed BakeMark's trade secrets from their work email to personal email addresses, including but not limited to, SP1B report, YTD Customer, Sales Report, Bowl Cost Calculators, BakeMark Capabilities drafted by Director of Marketing, ACCT #61640 information, Budget information, Funnel Call Planner (lists of all accounts to capture new business, and project future business).

52.    Upon information and belief, Defendants have unlawfully used and are continuing to use, and will continue to use in the future unless enjoined and restrained, BakeMark's Trade Secrets, as well as generally confidential and proprietary information contained in emails and information that they stole from BakeMark.

**-Defendants Unfairly Compete with BakeMark, Using the Misappropriated Trade Secret Materials-**

53.    Upon information and belief, Navarro, Klein and Bahner are plotting with Gary Hardgrove at Capitol and actors at Sunrise, to copy the BakeMark Trade Secrets, including the BakeMark Donut Line, to undermine BakeMark in the marketplace and steal its customers.

54. Hardgrove is a former Director level employee of BakeMark who has told two long-time BakeMark customers that Capitol, his new employer is already able to replicate BakeMark mixes. Such an ability could have only come from pilfering BakeMark's trade secret recipes, which, upon information and belief, Hardgrove impermissibly took from BakeMark prior to his departure or obtained from Navarro, Klein and Bahner.

55. Sunrise is, upon information and belief, working in conjunction with Capitol, and, as set forth further below, is plotting to distribute products unlawfully copied from BakeMark's arsenal of trade secret recipes in conjunction with Capitol, and Hardgrove, Capitol's current employee and BakeMark's former employee. Indeed these six actors are actively plotting to unfairly compete with BakeMark, and have violated several laws through this pernicious scheme.

56. Upon information and belief, Defendants have unlawfully used and are continuing to use, and will continue to use in the future unless enjoined and restrained, the trade secret information of BakeMark contained in information that they stole from BakeMark.

57. Specifically, BakeMark is aware that Defendants have *already duplicated* BakeMark's *entire* Donut Line, including its "Master Mix," "Super Roll" and "Super Speedee" and formulas for its Raise, Cake, Blueberry, Chocolate, Red Velvet, French Cruller, Buttermilk, Old Fashioned, and Vegan mixes. Defendants have manufactured these copycat products using the BakeMark Trade Secrets which they intend to sell under Capitol's name, and distribute through Sunrise.

58. Upon information and belief, Sunrise intends to sell a copycat of Super Speedee at $30 a bag, undercutting the artificial pricing that Bahner and Klein have forced their BakeMark supervisees to sell BakeMark's Super Speedee to customers.

## COUNT I

### (VIOLATION OF DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

### Against All Defendants)

59.     BakeMark restates and realleges the allegations contained in paragraphs 1-58 of this Complaint as if fully stated herein.

60.     The actions of Defendants, as described above, constitute violations of one or more provisions of the DTSA.

61.     The BakeMark Trade Secrets, including the BakeMark Donut Line are proprietary and confidential to BakeMark as described above, and they constitute protectable trade secrets under the DTSA.

62.     The DTSA applies because the BakeMark Trade Secrets, including the BakeMark Donut Line, are related to formulas, recipes, processes, pricing, proposals and strategic planning for work that is conducted in interstate commerce, and used for customers located throughout the United States.

63.     By engaging in the above conduct, Defendants, for the benefit of Capitol and Sunrise, have misappropriated the BakeMark Trade Secrets, including the BakeMark Donut Line, related to services used in, or intended for use in, interstate commerce.

64.     BakeMark has taken reasonable efforts to protect and maintain the secrecy and confidentiality of its trade secrets, including BakeMark's Efforts to Protect Trade Secrets set forth above.

65.     The BakeMark Trade Secrets are not generally known in the industry in which it operates or to the general public, and their secrecy confers substantial economic advantage and benefit to BakeMark. Knowledge of this information would also confer a substantial economic benefit to BakeMark's competitors, including Capitol and Sunrise.

66.     The circumstances of Navarro, Klein, and Bahner's employment with BakeMark gave rise to fiduciary duties and obligations to maintain the secrecy of

BakeMark's Trade Secrets and to strictly limit the use of such trade secrets to BakeMark's business activities and for BakeMark's exclusive benefit.

67.     In addition, through the Agreements, Navarro, Klein, and Bahner were obligated to maintain the secrecy and confidentiality of all of BakeMark's Trade Secrets.

68.     Upon information and belief, Navarro, Klein, Bahner and Hardgrove, acting as agents of Capitol and Sunrise, through improper means and without authorization, acquired BakeMark's trade secrets to and for the benefit of themselves, threatened to and/or did disclose and use such trade secrets without BakeMark's consent, in order to unfairly compete with BakeMark and to poach its customers.

69.     Defendants can derive and have derived economic value from the disclosure and use of BakeMark's Trade Secrets, for example, by avoiding the considerable time, effort and expense it took BakeMark to develop its trade secrets, product groupings and customer relationships, and to convert BakeMark's customers for their own financial gain.

70.     Defendants' misappropriation of BakeMark's Trade Secrets has caused BakeMark to suffer and will cause BakeMark to continue to suffer damage and irreparable harm, absent immediate injunctive relief. Because BakeMark's remedy at law is inadequate, it seeks preliminary and permanent injunctive relief to recover and protect its confidential, proprietary and trade secret information.

71.     Unless and until enjoined, Defendants will continue to receive the benefit of BakeMark's Trade Secrets misappropriated by Defendants, which have aided and will continue to aid Defendants to unfairly compete against BakeMark.

72.     Defendants' misappropriation has proximately caused damages to BakeMark, including, but not limited to, loss of profits, goodwill, competitive advantage and business opportunities.

73.     As a direct and proximate result of Defendants' deliberate, willful and malicious misappropriation of BakeMark's Trade Secrets, BakeMark has sustained

and will continue to sustain severe, immediate and irreparable harm, damage and injury to the value of its trade secrets, its competitive advantage and its customer relationships and goodwill, all of which BakeMark has expended significant time, effort and money to secure.  Defendants' actions were willful, fraudulent, malicious, and committed with the intent to injure and oppress, justifying an award of punitive damages against Defendants pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. §1836(b)(3)(D).

<u>COUNT II</u>
**(Breach of Contract against Navarro, Klein and Bahner)**

74.     BakeMark restates and realleges the allegations contained in paragraphs 1-58 of this Complaint as if fully stated herein.

75.     Navarro, Klein and Bahner entered into the valid and legally enforceable Agreements, attached hereto as Exhibits A-C.

76.     The confidentiality/non-disclosure/non-solicitation provisions of these Agreements are reasonable in scope and are reasonably necessary to protect BakeMark's legitimate interest in maintaining the confidentiality of its confidential and proprietary information.  Such provisions also are intended to prevent employees from misappropriating, retaining or failing to surrender and/or using such information in an improper and anticompetitive manner.

77.     BakeMark has at all times performed and fulfilled its obligations under the Agreements, except for those obligations that have either been excused from performance or been prevented from being performed by virtue of breaches of Navarro, Klein and Bahner.

78.     In exchange for their commitment to be bound by the contractual obligations set forth in the Agreements, Navarro, Klein and Bahner received adequate and sufficient consideration, including employment by BakeMark.

79.     Navarro, Klein and Bahner have each breached Paragraph 4 of the Agreements, including by failing to hold BakeMark's Confidential Information in

strict confidence, and upon information and belief, by disclosing such information to third parties, including to BakeMark's competitor Capitol and Sunrise, and by using the Confidential Information in a manner other than in furtherance of their duties to BakeMark.

80.     Further, Navarro, Klein and Bahner have each breached Provision 6 of the Agreements during their employment by diverting, unlawfully interfering with, or attempt to divert or unlawfully interfere with, BakeMark's business relationship with its customers, including Restricted Customers with whom BakeMark has conducted business in the past two years and with whom during such time Navarro, Klein and Bahner have had business-related contact or about whom they were privy to Confidential Information.

81.     Further, Navarro, Klein and Bahner have each breached Provision 7 of the Agreements during their employment, including by directly and/or by assisting others to solicit, induce or encourage any Restricted Employees, (i.e. those persons working for BakeMark in the past two years, and with whom during such time Navarro, Klein and Bahner have had supervisory responsibility, work-related contact or they were privy to personnel information relating to such persons' compensation, benefits, job duties or performance evaluations),  to terminate their employment or other association with BakeMark or to work for a Competing Business.

82.     The foregoing breaches and continuing breaches have directly and proximately caused and will continue to cause BakeMark severe, immediate and irreparable harm, and damages in an amount according to proof at the time of trial.

83.     Further, because of the irreparable nature of the harm caused by Navarro, Klein and Bahner's breaches, under Provision 11 of the Agreements, BakeMark is entitled to injunctive relief and its reasonable costs and attorneys' fees.

## COUNT III
### (Breach of Duty of Loyalty against Navarro, Klein and Bahner)

84.     BakeMark restates and realleges the allegations contained in paragraphs 1-58 of this Complaint as if fully stated herein.

85.     As employees of BakeMark, Navarro, Klein and Bahner owe a duty of loyalty to BakeMark under California Labor Code Sections 2860 and 2863 and under common law.

86.     BakeMark is informed and believes, and thereon alleges, that during their employment at BakeMark, Navarro, Klein and Bahner have knowingly and willfully, and without BakeMark's consent, engaged in acts that are inimical to the best interests of BakeMark, thus breaching their duty of loyalty to BakeMark, including but not limited to, using BakeMark's resources to prepare to compete with BakeMark, accessing, using, and taking BakeMark's confidential, proprietary and trade secret information to use as a springboard to compete at their new company, Sunrise, to work to better the interests of Capitol, Sunrise and themselves, at the expense of devoting best efforts to BakeMark prior to their departure, deliberately failing to fulfill their job responsibilities at BakeMark, including by failing to hire sales representatives, by deliberately destroying morale among their supervisees at BakeMark, including by making false statements about BakeMark to their direct reports, and by deliberately raising prices to price BakeMark out of the market, causing BakeMark to lose long-term customers.

87.     The foregoing misconduct constitutes breaches of the duty of loyalty, which has directly and proximately caused BakeMark harm, entitling it to injunctive relief, restitution, disgorgement, and/or damages in an amount to be proven at trial. As a result of Defendants' breaches of the duty of loyalty, BakeMark also seeks damages for the loss of long-standing clients and business opportunities.

88.     The aforementioned conduct of Defendants was wanton, willful, oppressive, fraudulent and/or malicious and was undertaken by each with the intent

to cause substantial injury to BakeMark and/or was despicable conduct carried out by Defendants in willful and conscious disregard of BakeMark's rights. Accordingly, BakeMark is entitled to an award of punitive damages.

**<u>COUNT IV</u>**
**(Breach of Fiduciary Duty against Navarro, Klein and Bahner)**

89.    BakeMark restates and realleges the allegations contained in paragraphs 1-58 of this Complaint as if fully stated herein.

90.    Each of Navarro, Klein, and Bahner, as high-ranking managerial and director level employees, owe fiduciary duties to BakeMark.  Additionally, each is in a special relationship of confidence and trust with BakeMark which separately obligates each as a fiduciary of BakeMark.

91.    Navarro, Klein and Bahner each understood that BakeMark reposed trust and confidence in them and rightfully expected that each, in accordance with the terms and conditions of the Agreements, and their employment, would exercise good business judgment, maintain client confidentiality, act prudently in the operation of BakeMark's business, discharge their responsibilities and actions in good faith, act in the best interests of BakeMark, and avoid engaging in conduct that would directly benefit Navarro, Klein and Bahner to the exclusion of BakeMark, and harm BakeMark and/or deprive BakeMark of its business, clients and/or business opportunities.

92.    BakeMark is informed and believes, and thereon alleges, that Navarro, Klein and Bahner knowingly, willfully, and in disregard of BakeMark's rights and entitlements, breached their fiduciary duties, including by using BakeMark's resources to prepare to compete with BakeMark, accessing, using, and taking BakeMark's confidential, proprietary and trade secrets to use as a springboard to compete at their new company, Sunrise, and to aid Sunrise, Capitol and themselves at the expense of devoting best efforts to BakeMark prior to their departure, deliberately failing to fulfill their job responsibilities at BakeMark, including by

failing to hire sales representatives, by deliberately destroying morale among their supervisees at BakeMark by making false and disparaging statements about BakeMark to their direct reports, and by deliberately raising prices to price BakeMark out of the market, causing BakeMark to lose long-term customers.

93.    The foregoing misconduct constitutes breaches of Navarro, Klein and Bahner's fiduciary duties and, as a direct and proximate result of such breaches, BakeMark has sustained severe, immediate, and irreparable harm, damage, and injury, which entitles BakeMark to restitution, disgorgement and/or damages, and actual damages in an amount to be proven at trial.

94.    The aforementioned conduct of Navarro, Klein and Bahner was wanton, willful, oppressive, fraudulent, and/or malicious and was undertaken by each with the intent to cause substantial injury to BakeMark and/or was despicable conduct carried out by each in willful and conscious disregard of BakeMark's rights. Accordingly, BakeMark is entitled to an award of punitive damages.

## COUNT V
### (Violation of California Business and Professions Code §17200 Against all Defendants)

95.    BakeMark restates and realleges the allegations contained in paragraphs 1-58 of this Complaint as if fully stated herein

96.    Defendants' conduct, as alleged herein, constitutes unlawful, unfair acts and/or deceptive business practices and unfair competition in violation of California Business & Professions Code §§ 17200 *et seq.*

97.    Defendants engaged in such conduct without privilege, justification or excuse.

98.    Defendants' conduct, as alleged herein, is unlawful because it constitutes violations of multiple laws, including the DTSA, the CFAA, California Penal Code Section 502,  and constitutes breaches of contract, fiduciary duty and the duty of loyalty.

99.    Defendants Navarro, Klein and Bahner's conduct is unfair because it is unscrupulous and unethical.  Indeed, each has engaged in unfair acts to undermine BakeMark's ability to conduct its business and service its customers' needs in order to better position themselves to improperly solicit BakeMark's clients and employees and to otherwise unfairly compete with BakeMark. They have artificially increased prices on BakeMark's products with the goal of undercutting BakeMark once their competing (and stolen) line of products goes to market.  Additionally, they have created comparison charts for sales persons to be able to switch customers to their copycat brand on many items, using BakeMark's internal data to do, which would have taken weeks and months of research without BakeMark's information. They have, upon information and belief, stolen BakeMark's Trade Secrets, including BakeMark's Donut Line to work with Capitol and Sunrise to create exact duplicate products to compete with BakeMark.   In addition, Navarro, Klein and Bahner engaged in the foregoing misconduct with an intent to harm the reputation and economic value of BakeMark.

100.    Defendants Hardgrove, Capitol and Sunrise's conduct is unfair because it is unscrupulous and unethical. Indeed, upon information and belief, they have been active plotting to copy the BakeMark proprietary, trade secret recipes, and formulas to undermine BakeMark in the marketplace and steal its customers. Hardgrove has gone so far as to tell long-time BakeMark customers that Capitol, his new employer is able to replicate BakeMark Mixes, a feat only possible through deception and subterfuge.   They have already copied and manufactured identical copies of BakeMark's proprietary products, which they intend to sell under Capitol's label. This unscrupulous behavior by a former employee and competitors is the very definition of unfair competition and was, upon information and belief, done at Capitol's and Sunrise's behest.

101.    The foregoing misconduct constitutes unlawful, unfair and deceptive business practices and unfair competition in violation of California Business &

Professions Code §§ 17200 *et seq*., and as a direct and proximate result of such unlawful, unfair and deceptive business practices and unfair competition, BakeMark has sustained severe, immediate and irreparable harm, damage and injury, which entitles BakeMark to restitution, disgorgement and/or damages, and such other relief permitted under California Business & Professions Code §§ 17200 *et seq*.

102.   As a further direct and proximate result of Defendants' unlawful, unfair and deceptive business practices and unfair competition, Defendants have been unjustly enriched by, among other things, unfairly competing and deriving economic benefit therefrom at the expense of BakeMark.

## COUNT VI
### (Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030, Against Navarro, Klein and Bahner)

103.   BakeMark restates and realleges the allegations contained in paragraphs 1-58 of this Complaint as if fully stated herein.

104.   The CFAA provides a private cause of action against anyone who intentionally accessed a computer without authorization or exceeded her authorized access to obtain information from a protected computer. 18 U.S.C. § 1030(a)(2)(C).

105.   The CFAA defines a "protected computer" as a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B).

106.   The CFAA allows for a private cause of action if there is a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)**.**

107.   BakeMark's computer systems are used in and affect interstate commerce by allowing for business operations in multiple states, with BakeMark operating nationwide.

108.   BakeMark's trade secret recipes and formulas are housed on locked-down servers and systems within BakeMark's computer systems to which access is

restricted to only authorized users.  Indeed, permission to access the portions of these systems/servers on which the recipes and formulas are housed may only be granted by certain C-Suite level employees and was not granted to Navarro, Klein or Bahner.

109.   Upon information and belief, Navarro, Klein, and Bahner intentionally accessed these computer systems without authorization or exceeded their authorized access to obtain information from these computer systems.

110.   BakeMark has suffered — and continues to suffer — losses in excess of $5,000.00 in a one-year period, including, without limitation, the costs of investigating the incident, and the costs of internal time spent ensuring that Navarro, Klein and Bahner's unauthorized access was discontinued.

111.   As a result of these wrongdoings, BakeMark has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury, for which there is no adequate remedy at law to compensate because BakeMark has no means of determining what other documents and data Navarro, Klein and Bahner may have viewed or manipulated without consent.

## COUNT VII
### (Violation of California Penal Code §502 Against Navarro, Klein and Bahner)

112.   BakeMark restates and realleges the allegations contained in paragraphs 1-58 of this Complaint as if fully stated herein.

113.   California Penal Code § 502(c)(1) *et seq.* makes it unlawful for an individual to knowingly access and without permission use any data, computer, computer system, or computer network to wrongfully control or obtain data.

114.   Upon information and belief, Navarro, Klein and Bahner knowingly accessed and without permission used BakeMark's computers, computer system and/or computer network to wrongfully control or obtain BakeMark's property and data in violation of California Penal Code § 502(c)(1).

115.   Upon information and belief, Navarro, Klein and Bahner knowingly accessed and without permission took, copied, and/or used data and supporting documentation from BakeMark's computers, computer systems and/or computer networks in violation of California Penal Code § 502(c)(2).

116.   Upon information and belief, Navarro, Klein and Bahner accessed or caused to be accessed without permission BakeMark's computer, computer system, or computer network in violation of California Penal Code § 502(c)(7).

117.   BakeMark has suffered and continues to suffer damages as a result of Navarro, Klein and Bahner's violations identified above.

118.   Navarro, Klein and Bahner's conduct has caused irreparable harm and injury to BakeMark, and unless enjoined, will cause further irreparable harm and injury for which BakeMark has no adequate remedy at law.

119.   California Penal Code § 502(e)(1) provides a civil remedy to the owner of any computer system who suffers damage by reason of a violation of any provision of subdivision (c).  Accordingly, BakeMark is entitled to compensatory damages, injunctive or other equitable relief, attorneys' fees, and costs.

## COUNT VIII
### (Intentional Interference with Prospective Economic Relations Against Navarro, Klein and Bahner)

120.   BakeMark restates and realleges the allegations contained in paragraphs 1-58 of this Complaint as if fully stated herein.

121.   BakeMark has a variety of long-term customer relationships with customers who have placed regular orders through BakeMark over a period of many years, including, but not limited to, Polly's Pies, Maria's Panaderia, Los Altos Meat Market, Maria's Bakery, Artisan Foods, Superior Grocers, El Super, Cardenas, Real Ranch Market, Big Saver, and Hansen's that likely would have resulted in further economic benefit to BakeMark.

122.   At all relevant times, Navarro, Klein and Bahner knew of the existence and nature of these relationships between BakeMark and its customers.

123.   Navarro, Klein and Bahner engaged in independently wrongful conduct, separate and apart from their interference, including breaches of fiduciary duty and loyalty, breaches of contract, and trade secret theft.

124.   Navarro, Klein and Bahner intended to disrupt BakeMark's relationships with its customers, and or knew that the disruption of the relationship was certain or substantially certain to occur, when they purposefully increased prices to non-competitive rates to these customers to attempt to disrupt these relationships, by dissuading customers from continuing to order from BakeMark at these inflated prices.

125.   BakeMark's relationships with its customers were disrupted.

126.   As a result of the foregoing, BakeMark has suffered severe, immediate and irreparable harm, and damages in an amount according to proof at the time of trial.

## **PRAYER FOR RELIEF**

Wherefore, BakeMark prays for judgment on all causes of action against Defendants as follows:

1.    For a temporary, preliminary and permanent injunction:

(1)   enjoining Defendants, and all other persons or entities acting in concert with or on behalf of them, from directly or indirectly disclosing or using BakeMark's Trade Secrets and confidential information;

(2)   ordering Defendants, and all other persons or entities acting in concert with or on behalf of them, to preserve and return to BakeMark all electronic files, hard-copy documents, including copies thereof, and other material and property belonging to BakeMark in their possession, custody and/or control; and

(3)   ordering Defendants to submit all devices which have ever been used in conjunction with any BakeMark property, as well as all personal devices and

accounts wherein BakeMark's Trade Secrets and confidential information may be located, for forensic review.

2.      Compensatory, consequential, incidental, nominal and/or special damages in amount according to proof.

3.      Punitive damages.

4.      Compensation for unjust enrichment.

5.      Injunctive relief, restitution, and disgorgement and such other relief permitted under Cal. Bus. & Prof. Code § 17200.

6.      Pre-judgment and post-judgment interest.

7.      For costs of suit incurred herein.

8.      For attorneys' fees incurred herein.

9.      For such other and further relief as the court may deem proper.

## **JURY DEMAND**

Wherefore BakeMark demands a trial by jury on all claims for damages.

Dated:        March 22, 2021              VEDDER PRICE (CA), LLP

By: /s/ Deborah A. Hedley
        Deborah A. Hedley

Attorneys for Plaintiff
BAKEMARK USA, LLC

# EXHIBIT A

**BakeMark**

## EMPLOYEE NON-SOLICITATION, INVENTIONS, & CONFIDENTIALITY AGREEMENT

This Employee Non-Solicitation, Inventions & Confidentiality Agreement (this "Agreement") is entered into between BakeMark USA LLC (the "Company") and Javier Navarro ("Employee").

**WHEREAS**, Employee is employed by, or is about to be employed by the Company;

**WHEREAS**, the Company and Employee agree that through Employee's employment with the Company, Employee will receive (or has received) significant training and will gain (or has gained) significant knowledge and expertise in specific areas related to the Company's business of manufacturing and marketing ready-to-use icings, fillings, mixes and bases, frozen dough and batters, donut glazes, icing bases, icing and glaze stabilizers, cake frosting and related products ("Baking Products"), which training, knowledge and expertise Employee would not have otherwise obtained;

**WHEREAS**, Employee and the Company further agree that through Employee's employment with the Company, Employee will be placed in a position of trust and confidence with the Company and that the Company will provide (or has provided) Employee with confidential and proprietary information concerning its business, products, suppliers, manufacturers, pricing, customers, and employees, and will entrust Employee with business relationships and good will of great value to the Company;

**WHEREAS**, the Company and Employee also agree that through Employee's employment with the Company, Employee may conceive or produce (or has conceived or produced) inventions relating to the Company's business and may learn or develop Confidential Information, as defined below, the disclosure of which to any third party would cause irreparable harm to the Company;

**WHEREAS**, the Company and Employee also agree that through Employee's employment with the Company, Employee may use confidential customer information provided by the Company or developed by Employee; and

**WHEREAS**, in light of the foregoing, Employee and the Company agree that the following restrictions are necessary and reasonable for the protection of the Company's legitimate business interests, including its investment in Employee's training, its good will, its confidential information and customer relationships, and the continued success of its business.

**NOW, THEREFORE**, in consideration of Employee's employment or continued employment with the Company, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employee and the Company agree as follows:

1.   No Restrictions on Employee

Employee warrants and represents that Employee is not subject to any non-competition/non-solicitation restriction or other restrictive covenant that would restrict Employee's ability to enter into this Agreement or perform the duties required by the Company in conjunction with Employee's employment. Employee will not disclose to the Company, or use on its behalf, any confidential or proprietary information of a former employer or other third party if an obligation exists to protect the confidentiality of such information.

2.   Notification to Third Parties

Employee acknowledges and agrees that the Company may notify any future or prospective employer of Employee, any client of the Company, or any other appropriate third party of the existence and the terms of this Agreement.

3.   Independent Enforceability

Each of the rights and remedies set forth in this Agreement will be independent of the others, and will be in addition to, and not in lieu of, any other rights and remedies available to the Company under law or equity or applicable to Employee under any other the Company policy or guideline.

4.   Disclosure of Confidential Information

Employee shall hold Confidential Information (as defined below) in the strictest confidence and shall not, without the prior written authorization of an authorized the Company officer, or as required by law, disclose Confidential Information in any manner to any person, or use Confidential Information in any way, other than in the furtherance of Employee's duties during his/her employment with the Company. The foregoing obligation shall apply at all times during employment with the Company and for a period of five (5) years thereafter, unless such information qualifies as a trade secret, in which case the foregoing obligation shall continue for so long as the trade secret remains protected under applicable law. Employee will not copy, duplicate or reproduce Confidential Information for any purpose other than for use by or on behalf of the Company and will not improperly take or retain such information without the Company's prior written consent. Employee will comply with all Company policies, procedures and practices pertaining to such Confidential Information and take all commercially reasonable steps to protect and maintain the secrecy thereof.

(a)    "Confidential Information," as used herein, means trade secrets (as defined by applicable law) or other confidential and proprietary information relating to the Company's customers, manufacturing, products, services, pricing and sales, research, business, practices, procedures or Baking Products not generally known by or available to the public that Employee becomes privy to by virtue of employment with the Company, including but not limited to the following:

(i)    collected or compiled information about the Company's customers, including names,

DocuSign Envelope ID: 4C4B3DF74E2-E4C2-4074-8774-A8DB9592D0649

addresses, telephone numbers, contact persons and other identifying information with respect to the needs and requirements for customers; information dealing with the nature of customers' accounts, including the dates on which agreements between the Company and such customers will end and/or be subject to renewal; and rate and price information and history relating to products provided by the Company to its customers;

(ii)      information about the Company's internal methods of operation and manufacturing, including information relating to the machinery, equipment, processes, product mix and formulas by which the Company develops and manufactures its Baking Products; and

(iii)      information about the Company's sales, finances and business, including business and marketing plans, practices and strategies; information with respect to the Company's suppliers and the availability of materials and supplies used in its business; and non-published financial information relating to the Company's income, budgeting, cost structures, expenses, profits and general financial standing.

Confidential Information does not include any information that is or shall become generally known in the trade through no fault of Employee; any information Employee receives in good faith from a third party who has the right to disclose such information and who has not received such information, either directly or indirectly, from the Company; or any information that was within Employee's legitimate possession prior to his/her employment by the Company.

Confidential Information disclosed by the Company or any of its affiliates to Employee will remain the exclusive property of the Company or its affiliates, and all rights to Confidential Information will be held in trust by Employee for the benefit of the Company. Neither this Agreement nor the disclosure or revelation of Confidential Information will constitute or be construed as granting to Employee, by implication or otherwise, any right, title or license under any patent, patent application, trademark, copyright or any know-how to which the Company or any of its affiliates now has or hereafter may obtain, or as imposing on Employee any obligation, except as specified in this Agreement. The Company does not make any representations or warranties regarding the infringement of any patents, trademarks or copyrights held by any third party.

Notwithstanding anything herein to the contrary, Employee may not be held criminally or civilly liable under any federal or state trade secrets law for any disclosure of a trade secret that is (i) made in confidence to a federal, state or local governmental, regulatory or administrative agency, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law, or (ii) set forth in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and provided Employee does not otherwise disclose such information except pursuant to court order. Nothing herein is intended, or should be construed, to affect the immunities created by the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq., or other applicable law.

5.      Return of Materials

Upon termination of Employee's employment with the Company, whether with or without cause, and whether initiated by Employee or the Company ("Termination"), or at any other time at the Company's request, Employee shall deliver to the Company all of its materials, documents, plans, records, notes, drawings, or papers and any copies thereof (whether electronic or hard copy) which may be in Employee's possession or under Employee's control pertaining to the Company's business, including in particular all notes or records Employee has relating to the Company customers, prospective customers or Confidential Information. Immediately upon Termination, Employee will not access, download, delete, erase or transmit any information stored on any Company server, network, web-based data storage account or service, computer, e-mail account, intranet, telephone/voicemail system, smartphone or electronic storage device without the Company's prior written consent, and will refrain from accessing any Confidential Information stored on any personal computer, e-mail account, tablet, smartphone, electronic storage device or web-based data storage account or service. Employee will inform the Company of all such media and, upon direction from the Company, will permanently delete and erase any Confidential Information stored on such media and/or allow the Company or its designee to access and forensically examine such media to ensure that all such information has been permanently deleted and erased. Upon request from the Company, Employee shall certify in writing that he or she has fully complied with the obligations set forth in this Section 5.

6.      Customer      Non-Solicitation/No-Service/Non-Interference

Employee agrees that during employment with the Company and for a period of one (1) year after Termination, Employee will not directly or by assisting others: (a) solicit, call upon or contact any Restricted Customers (as defined below) for the purpose of providing products or services that are competitive with Baking Products and related services offered or provided by the Company within two (2) years prior to Termination ("Competitive Products or Services"); (b) contract with, sell to or perform services for or on behalf of any Restricted Customers in connection with Competitive Products or Services; or (c) divert, unlawfully interfere with, or attempt to divert or unlawfully interfere with, the Company's business relationship with any Restricted Customers. The term "Restricted Customers" means existing customers with whom the Company has conducted business within two (2) years prior to Termination and with whom during such time Employee had business-related contact or was privy to Confidential Information.

Notwithstanding anything herein to the contrary: (y) if Employee is employed by the Company in California or North Dakota, or in Colorado and is not executive or management personnel or an officer or employee who constitutes professional staff to executive or management personnel, the foregoing restriction shall not apply; and (z) if Employee is employed by the Company in Nevada or Oklahoma, subsection (b) shall not apply.

7.      Employee Non-Solicitation/No-Hire

Employee agrees that during employment with the Company and for a period of one (1) year after Termination, Employee will not directly or by assisting others: (a) solicit, induce or encourage any Restricted Employees (as defined below) to terminate their employment or other association with the Company or to work for a Competing Business; or (b) hire,

DocuSign Envelope ID: 435E7893-ENCB-43/7-4475-8B95920C3313

caused to be hired or attempt to hire any Restricted Employees on behalf of a Competing Business. The term "Restricted Employees" means each and every person employed or otherwise engaged by the Company, including independent contractors, within two (2) years prior to Termination and with whom during such time Employee had supervisory responsibility, work-related contact or was privy to personnel information relating to such persons' compensation, benefits, job duties or performance evaluations.  Notwithstanding the foregoing, "Restricted Employees" does not include persons who have not been employed or otherwise engaged by the Company for more than six (6) months at the time of any such solicitation, inducement, encouragement, hiring or attempted hiring. The term "Competing Business" means any individual (including Employee), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is directly engaged in whole or in relevant part in any business or enterprise which is competitive with the business conducted by the Company, including the manufacturing, marketing and sale of Baking Products.

Notwithstanding anything herein to the contrary: (y) if Employee is employed by the Company in California or North Dakota, or in Colorado and is not executive or management personnel or an officer or employee who constitutes professional staff to executive or management personnel, the foregoing restriction shall not apply; and (z) if Employee is employed by the Company in Oklahoma, subsection (b) shall not apply.

8.    Tolling of Restrictive Periods

If Employee breaches any of the restrictions set forth in Sections 6 or 7 and the Company commences a legal proceeding in connection therewith, the time period applicable to each such restriction shall be tolled and extended for a period of time equal to the period of time during which Employee is determined by a court of competent jurisdiction to be in non-compliance or breach (not to exceed twelve (12) months) commencing on the date of such determination.

9.    Inventions

(a)    Ownership of Inventions.  Employee agrees that all Inventions (as defined below) will be the sole and exclusive property of the Company.  Employee will, with respect to any Invention, (i) keep current, accurate, and complete records, which will belong to the Company and be kept and stored on the Company's premises; (ii) promptly and fully disclose the existence and describe the nature of the Invention to the Company in writing (and without request); (iii) assign (and Employee hereby assigns) to the Company all of Employee's right, title and interest in and to the Invention, any applications Employee makes for patents or copyrights in any country, and any patents or copyrights granted to Employee in any country; and (iv) acknowledge and deliver promptly to the Company any written instruments, and perform any other acts necessary in the Company's opinion to preserve property rights in the Invention against forfeiture, abandonment or loss and to obtain and maintain letters patent and/or copyrights on the Invention and to vest the entire right and title to the Invention in the Company.  Employee agrees to perform promptly (without charge to the Company but at the expense of the Company) all acts as may be necessary in the Company's opinion to preserve all patents and/or copyrights granted upon the Inventions.

(b)    Notice.  Employee is hereby notified that, in accordance with California Labor Code § 2870, this Agreement does not apply to any Inventions that Employee developed entirely on Employee's own time without using the Company's equipment, supplies, facility, or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or (2) result from any work performed by Employee for the Company.

(c)    Separate Assignment Agreement.  The terms of the foregoing assignment as to any Invention may be subject to a separate assignment agreement between Employee and the Company.  The existence of such an assignment agreement shall have no effect on the assignment pursuant to this Agreement of any other Invention.

(d)    Works Made for Hire.  To the extent that any Invention qualifies as "work made for hire" as defined in 17 U.S.C. § 101 (1976), as amended, such Invention will constitute "work made for hire" and, as such, will be the exclusive property of the Company.

(e)    Presumption.  In the event of any dispute, arbitration or litigation concerning whether an invention, discovery, improvement or idea made or conceived by Employee is the property of the Company, such invention, discovery, improvement or idea will be presumed the property of the Company and Employee will bear the burden of establishing otherwise.

(f)    "Inventions," as used herein, means any inventions, discoveries, improvements and ideas, whether or not in writing or reduced to practice and whether or not patentable or copyrightable, made, authored or conceived by Employee in connection with his/her employment with the Company, whether by Employee's individual efforts or in connection with the efforts of others.

10.    Reasonableness of Restrictions

Employee stipulates that the restrictions and obligations in this Agreement are reasonable and necessary for the protection of the Company's legitimate business interests, do not prohibit Employee from using general skills and know-how acquired during or prior to employment with the Company, and do not preclude Employee from earning a livelihood, working in his or her chosen field or otherwise impose any undue hardship.

11.    Right to Injunction

The parties recognize that the Company will suffer irreparable damage if Employee violates or threatens to violate the terms of Sections 4, 5, 6, 7 and 9, and that such damage would be difficult to quantify, and it is therefore agreed that, in the event of a breach or threatened breach of said Sections, the Company shall be entitled to injunctive relief, in addition to all other legal and equitable remedies available to it, without the necessity of posting a bond or other security.  The prevailing party in any such action shall be entitled to recover its reasonable costs and attorneys' fees.

12.    Protected Activities

DocuSign Envelope ID: 435E7893-ENCB-4577-84/3-8BB9592DC919

Nothing in this Agreement prohibits Employee (with or without notice to the Company) from reporting allegations to, responding to compulsory legal process issued from, testifying before or otherwise participating in an investigation or proceeding conducted by a federal, state or local government body, administrative agency or judicial authority concerning an unlawful employment practice, illegal conduct or a suspected violation of law, including, but not limited to, acts and omissions prohibited by Title VII of the Civil Rights Act of 1964, the Securities Exchange Act of 1934 or other comparable state and federal laws. Nor does anything in this Agreement prohibit Employee from making truthful statements and disclosures regarding alleged unlawful discrimination, harassment and/or retaliation or from discussing the terms, wages and working conditions of employment with the Company.

13.   Entire Agreement

This Agreement constitutes the entire agreement between Employee and the Company regarding the subject matter hereof, and replaces and supersedes all prior or contemporaneous communications, agreements or representations governing the same subject matter; provided, however, that this Agreement shall supplement to the extent possible any related Company policy or guideline contained in the Company's Employee Handbook or Policy Manual. In the event of any conflict between this Agreement and any Company policy, this Agreement shall control and govern.

14.   Interpretation; Severability of Invalid Provisions

All rights and restrictions contained in this Agreement may be exercised and shall be applicable and binding only to the extent that they do not violate any applicable laws, and are intended to be limited to the extent necessary so that they will not render this Agreement illegal, invalid or unenforceable. If any term of this Agreement shall be held to be illegal, invalid or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect. If a court of competent jurisdiction holds any provision to be overbroad or unreasonable as written, the parties agree that the court shall reasonably alter such provision to the extent necessary to make the provision enforceable under applicable law, and enforce the provision as amended.

15.   Survival

The restrictions and obligations in Sections 2, 4, 5, 6, 7 and 9 shall survive the termination of this Agreement and the termination of Employee's employment with the Company.

16.   Agreement Binding

This Agreement shall inure to the benefit of the Company and its successor, assignees, and designees and shall be binding upon Employee and his/her heirs, executors, administrators and personal representatives.

17.   Choice of Law

This Agreement shall be governed by and construed in accordance with the substantive laws of the state of Georgia.

18.   Waiver

No provision of this Agreement may be waived except in a writing duly signed by the party waiving such provision. Either party's action in not enforcing a breach of this Agreement shall not prevent such party from enforcing this Agreement as to such breach or any other breach.

19.   Modification

Except as provided in Section 14, any additions, changes or modifications to this Agreement must be in writing, signed by Employee and the president of the Company. The President of the Company is the only the Company official with authority to make any additions, changes or modifications to this Agreement, enter into any contrary agreement, or to provide the Company's express written consent as described in Paragraph 4 of this Agreement.

20.   Counterparts

This Agreement may be executed in any number of original counterparts or by facsimile or e-mail, each of which when executed and delivered will be deemed to be an original and all of which taken together will constitute but one and the same instrument. One or more counterparts of this Agreement may be delivered by facsimile or other electronic means, with the intention that delivery by such means shall have the same effect as delivery of an original counterpart hereof.

**Employee:**

Signature ___ *Javier Navarro* ___
3009887977471...

Javier Navarro
Printed Name

2/18/2021
Date

**BakeMark USA, LLC:**

Signature ___ *Robert Braden* ___
1062B2307EC448...

Robert Braden
Printed Name

Manager, Human Resources
Title

2/18/2021
Date

# EXHIBIT B

DocuSign Envelope ID: 32B809C2-988B-43C6-A497-4C3CBF0EAC2C

**BAKEMARK**

## EMPLOYEE NON-SOLICITATION, INVENTIONS, & CONFIDENTIALITY AGREEMENT

This Employee Non-Solicitation, Inventions & Confidentiality Agreement (this "Agreement") is entered into between BakeMark USA LLC (the "Company") and _Jeffrey Klein_ ("Employee").

**WHEREAS**, Employee is employed by, or is about to be employed by the Company;

**WHEREAS**, the Company and Employee agree that through Employee's employment with the Company, Employee will receive (or has received) significant training and will gain (or has gained) significant knowledge and expertise in specific areas related to the Company's business of manufacturing and marketing ready-to-use icings, fillings, mixes and bases, frozen dough and batters, donut glazes, icing bases, icing and glaze stabilizers, cake frosting and related products ("Baking Products"), which training, knowledge and expertise Employee would not have otherwise obtained;

**WHEREAS**, Employee and the Company further agree that through Employee's employment with the Company, Employee will be placed in a position of trust and confidence with the Company and that the Company will provide (or has provided) Employee with confidential and proprietary information concerning its business, products, suppliers, manufacturers, pricing, customers, and employees, and will entrust Employee with business relationships and good will of great value to the Company;

**WHEREAS,** the Company and Employee also agree that through Employee's employment with the Company, Employee may conceive or produce (or has conceived or produced) inventions relating to the Company's business and may learn or develop Confidential Information, as defined below, the disclosure of which to any third party would cause irreparable harm to the Company;

**WHEREAS,** the Company and Employee also agree that through Employee's employment with the Company, Employee may use confidential customer information provided by the Company or developed by Employee; and

**WHEREAS,** in light of the foregoing, Employee and the Company agree that the following restrictions are necessary and reasonable for the protection of the Company's legitimate business interests, including its investment in Employee's training, its good will, its confidential information and customer relationships, and the continued success of its business.

**NOW, THEREFORE**, in consideration of Employee's employment or continued employment with the Company, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employee and the Company agree as follows.

1.      No Restrictions on Employee

Employee warrants and represents that Employee is not subject to any non-competition/non-solicitation restriction or other restrictive covenant that would restrict Employee's ability to enter into this Agreement or perform the duties required by the Company in conjunction with Employee's employment. Employee will not disclose to the Company, or use on its behalf, any confidential or proprietary information of a former employer or other third party if an obligation exists to protect the confidentiality of such information.

2.      Notification to Third Parties

Employee acknowledges and agrees that the Company may notify any future or prospective employer of Employee, any client of the Company, or any other appropriate third party of the existence and the terms of this Agreement.

3.      Independent Enforceability

Each of the rights and remedies set forth in this Agreement will be independent of the others, and will be in addition to, and not in lieu of, any other rights and remedies available to the Company under law or equity or applicable to Employee under any other the Company policy or guideline.

4.      Disclosure of Confidential Information

Employee shall hold Confidential Information (as defined below) in the strictest confidence and shall not, without the prior written authorization of an authorized the Company officer, or as required by law, disclose Confidential Information in any manner to any person, or use Confidential Information in any way, other than in the furtherance of Employee's duties during his/her employment with the Company.  The foregoing obligation shall apply at all times during employment with the Company and for a period of five (5) years thereafter, unless such information qualifies as a trade secret, in which case the foregoing obligation shall continue for so long as the trade secret remains protected under applicable law. Employee will not copy, duplicate or reproduce Confidential Information for any purpose other than for use by or on behalf of the Company and will not improperly take or retain such information without the Company's prior written consent.  Employee will comply with all Company policies, procedures and practices pertaining to such Confidential Information and take all commercially reasonable steps to protect and maintain the secrecy thereof.

(a)      "Confidential Information," as used herein, means trade secrets (as defined by applicable law) or other confidential and proprietary information relating to the Company's customers, manufacturing, products, services, pricing and sales, research, business, practices, procedures or Baking Products not generally known by or available to the public that Employee becomes privy to by virtue of employment with the Company, including but not limited to the following:

(i)      collected or compiled information about the Company's customers, including names,

DocuSign Envelope ID: 32B809C2-660B-45C6-A437-4C3CBF0EAC2C

addresses, telephone numbers, contact persons and other identifying information with respect to the needs and requirements for customers; information dealing with the nature of customers' accounts, including the dates on which agreements between the Company and such customers will end and/or be subject to renewal; and rate and price information and history relating to products provided by the Company to its customers;

(ii)     information about the Company's internal methods of operation and manufacturing, including information relating to the machinery, equipment, processes, product mix and formulas by which the Company develops and manufactures its Baking Products; and

(iii)     information about the Company's sales, finances and business, including business and marketing plans, practices and strategies; information with respect to the Company's suppliers and the availability of materials and supplies used in its business; and non-published financial information relating to the Company's income, budgeting, cost structures, expenses, profits and general financial standing.

Confidential Information does not include any information that is or shall become generally known in the trade through no fault of Employee; any information Employee receives in good faith from a third party who has the right to disclose such information and who has not received such information, either directly or indirectly, from the Company; or any information that was within Employee's legitimate possession prior to his/her employment by the Company.

Confidential Information disclosed by the Company or any of its affiliates to Employee will remain the exclusive property of the Company or its affiliates, and all rights to Confidential Information will be held in trust by Employee for the benefit of the Company.  Neither this Agreement nor the disclosure or revelation of Confidential Information will constitute or be construed as granting to Employee, by implication or otherwise, any right, title or license under any patent, patent application, trademark, copyright or any know-how to which the Company or any of its affiliates now has or hereafter may obtain, or as imposing on Employee any obligation, except as specified in this Agreement.  The Company does not make any representations or warranties regarding the infringement of any patents, trademarks or copyrights held by any third party.

Notwithstanding anything herein to the contrary, Employee may not be held criminally or civilly liable under any federal or state trade secrets law for any disclosure of a trade secret that is (i) made in confidence to a federal, state or local governmental, regulatory or administrative agency, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law, or (ii) set forth in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and provided Employee does not otherwise disclose such information except pursuant to court order.  Nothing herein is intended, or should be construed, to affect the immunities provided by the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq., or other applicable law.

5.     Return of Materials

Upon termination of Employee's employment with the Company, whether with or without cause, and whether initiated by Employee or the Company ("Termination"), or at any other time at the Company's request, Employee shall deliver to the Company all of its materials, documents, plans, records, notes, drawings, or papers and any copies thereof (whether electronic or hard copy) which may be in Employee's possession or under Employee's control pertaining to the Company's business, including in particular all notes or records Employee has relating to the Company customers, prospective customers or Confidential Information. Immediately upon Termination, Employee will not access, download, delete, erase or transmit any information stored on any Company server, network, web-based data storage account or service, computer, e-mail account, intranet, telephone/voicemail system, smartphone or electronic storage device without the Company's prior written consent, and will refrain from accessing any Confidential Information stored on any personal computer, e-mail account, tablet, smartphone, electronic storage device or web-based data storage account or service.  Employee will inform the Company of all such media and, upon direction from the Company, will permanently delete and erase any Confidential Information stored on such media and/or allow the Company or its designee to access and forensically examine such media to ensure that all such information has been permanently deleted and erased.  Upon request from the Company, Employee shall certify in writing that he or she has fully complied with the obligations set forth in this Section 5.

6.     Customer          Non-Solicitation/No-Service/Non-Interference

Employee agrees that during employment with the Company and for a period of one (1) year after Termination, Employee will not directly or by assisting others: (a) solicit, call upon or contact any Restricted Customers (as defined below) for the purpose of providing products or services that are competitive with Baking Products and related services offered or provided by the Company within two (2) years prior to Termination ("Competitive Products or Services"); (b) contract with, sell to or perform services for or on behalf of any Restricted Customers in connection with Competitive Products or Services; or (c) divert, unlawfully interfere with, or attempt to divert or unlawfully interfere with, the Company's business relationship with any Restricted Customers.   The term "Restricted Customers" means existing customers with whom the Company has conducted business within two (2) years prior to Termination and with whom during such time Employee had business-related contact or was privy to Confidential Information.

Notwithstanding anything herein to the contrary: (y) if Employee is employed by the Company in <u>California</u> or <u>North Dakota</u>, or in <u>Colorado</u> and is not executive or management personnel or an officer or employee who constitutes professional staff to executive or management personnel, the foregoing restriction shall not apply; and (z) if Employee is employed by the Company in <u>Nevada</u> or <u>Oklahoma</u>, subsection (b) shall not apply.

7.     Employee Non-Solicitation/No-Hire

Employee agrees that during employment with the Company and for a period of one (1) year after Termination, Employee will not directly or by assisting others: (a) solicit, induce or encourage any Restricted Employees (as defined below) to terminate their employment or other association with the Company or to work for a Competing Business; or (b) hire,

DocuSign Envelope ID: 32B809C2-560B-45C6-A437-4C3CBF0EAC2C

caused to be hired or attempt to hire any Restricted Employees on behalf of a Competing Business. The term "Restricted Employees" means each and every person employed or otherwise engaged by the Company, including independent contractors, within two (2) years prior to Termination and with whom during such time Employee had supervisory responsibility, work-related contact or was privy to personnel information relating to such persons' compensation, benefits, job duties or performance evaluations. Notwithstanding the foregoing, "Restricted Employees" does not include persons who have not been employed or otherwise engaged by the Company for more than six (6) months at the time of any such solicitation, inducement, encouragement, hiring or attempted hiring. The term "Competing Business" means any individual (including Employee), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is directly engaged in whole or in relevant part in any business or enterprise which is competitive with the business conducted by the Company, including the manufacturing, marketing and sale of Baking Products.

Notwithstanding anything herein to the contrary: (y) if Employee is employed by the Company in <u>California</u> or <u>North Dakota</u>, or in <u>Colorado</u> and is not executive or management personnel or an officer or employee who constitutes professional staff to executive or management personnel, the foregoing restriction shall not apply; and (z) if Employee is employed by the Company in <u>Oklahoma</u>, subsection (b) shall not apply.

8.      <u>Tolling of Restrictive Periods</u>

If Employee breaches any of the restrictions set forth in Sections 6 or 7 and the Company commences a legal proceeding in connection therewith, the time period applicable to each such restriction shall be tolled and extended for a period of time equal to the period of time during which Employee is determined by a court of competent jurisdiction to be in non-compliance or breach (not to exceed twelve (12) months) commencing on the date of such determination.

9.      <u>Inventions</u>

(a)      <u>Ownership of Inventions.</u>  Employee agrees that all Inventions (as defined below) will be the sole and exclusive property of the Company.  Employee will, with respect to any Invention, (i) keep current, accurate, and complete records, which will belong to the Company and be kept and stored on the Company's premises; (ii) promptly and fully disclose the existence and describe the nature of the Invention to the Company  in writing (and without request); (iii) assign (and Employee hereby assigns) to the Company all of Employee's right, title and interest in and to the Invention, any applications Employee makes for patents or copyrights in any country, and any patents or copyrights granted to Employee in any country; and (iv) acknowledge and deliver promptly to the Company any written instruments, and perform any other acts necessary in the Company's opinion to preserve property rights in the Invention against forfeiture, abandonment or loss and to obtain and maintain letters patent and/or copyrights on the Invention and to vest the entire right and title to the Invention in the Company.  Employee agrees to perform promptly (without charge to the Company but at the expense of the Company) all acts as may be necessary in the Company's opinion to preserve all patents and/or copyrights granted upon the Inventions.

(b)      <u>Notice.</u>  Employee is hereby notified that, in accordance with California Labor Code § 2870, this Agreement does not apply to any Inventions that Employee developed entirely on Employee's own time without using the Company's equipment, supplies, facility, or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or (2) result from any work performed by Employee for the Company.

(c)      <u>Separate Assignment Agreement.</u>  The terms of the foregoing assignment as to any Invention may be subject to a separate assignment agreement between Employee and the Company.  The existence of such an assignment agreement shall have no effect on the assignment pursuant to this Agreement of any other Invention.

(d)      <u>Works Made for Hire.</u>  To the extent that any Invention qualifies as "work made for hire" as defined in 17 U.S.C. § 101 (1976), as amended, such Invention will constitute "work made for hire" and, as such, will be the exclusive property of the Company.

(e)      <u>Presumption.</u>  In the event of any dispute, arbitration or litigation concerning whether an invention, discovery, improvement or idea made or conceived by Employee is the property of the Company, such invention, discovery, improvement or idea will be presumed the property of the Company and Employee will bear the burden of establishing otherwise.

(f)      "<u>Inventions</u>," as used herein, means any inventions, discoveries, improvements and ideas, whether or not in writing or reduced to practice and whether or not patentable or copyrightable, made, authored or conceived by Employee in connection with his/her employment with the Company, whether by Employee's individual efforts or in connection with the efforts of others.

10.      <u>Reasonableness of Restrictions</u>

Employee stipulates that the restrictions and obligations in this Agreement are reasonable and necessary for the protection of the Company's legitimate business interests, do not prohibit Employee from using general skills and know-how acquired during or prior to employment with the Company, and do not preclude Employee from earning a livelihood, working in his or her chosen field or otherwise impose any undue hardship.

11.      <u>Right to Injunction</u>

The parties recognize that the Company will suffer irreparable damage if Employee violates or threatens to violate the terms of Sections 4, 5, 6, 7 and 9, and that such damage would be difficult to quantify, and it is therefore agreed that, in the event of a breach or threatened breach of said Sections, the Company shall be entitled to injunctive relief, in addition to all other legal and equitable remedies available to it, without the necessity of posting a bond or other security.  The prevailing party in any such action shall be entitled to recover its reasonable costs and attorneys' fees.

12.      <u>Protected Activities</u>

Nothing in this Agreement prohibits Employee (with or without notice to the Company) from reporting allegations to, responding to compulsory legal process issued from, testifying before or otherwise participating in an investigation or proceeding conducted by a federal, state or local government body, administrative agency or judicial authority concerning an unlawful employment practice, illegal conduct or a suspected violation of law, including, but not limited to, acts and omissions prohibited by Title VII of the Civil Rights Act of 1964, the Securities Exchange Act of 1934 or other comparable state and federal laws. Nor does anything in this Agreement prohibit Employee from making truthful statements and disclosures regarding alleged unlawful discrimination, harassment and/or retaliation or from discussing the terms, wages and working conditions of employment with the Company.

13. Entire Agreement

This Agreement constitutes the entire agreement between Employee and the Company regarding the subject matter hereof, and replaces and supersedes all prior or contemporaneous communications, agreements or representations governing the same subject matter; provided, however, that this Agreement shall supplement to the extent possible any related Company policy or guideline contained in the Company's Employee Handbook or Policy Manual. In the event of any conflict between this Agreement and any Company policy, this Agreement shall control and govern.

14. Interpretation; Severability of Invalid Provisions

All rights and restrictions contained in this Agreement may be exercised and shall be applicable and binding only to the extent that they do not violate any applicable laws, and are intended to be limited to the extent necessary so that they will not render this Agreement illegal, invalid or unenforceable. If any term of this Agreement shall be held to be illegal, invalid or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect. If a court of competent jurisdiction holds any provision to be overbroad or unreasonable as written, the parties agree that the court shall reasonably alter such provision to the extent necessary to make the provision enforceable under applicable law, and enforce the provision as amended.

15. Survival

The restrictions and obligations in Sections 2, 4, 5, 6, 7 and 9 shall survive the termination of this Agreement and the termination of Employee's employment with the Company.

16. Agreement Binding

This Agreement shall inure to the benefit of the Company and its successor, assignees, and designees and shall be binding upon Employee and his/her heirs, executors, administrators and personal representatives.

17. Choice of Law

This Agreement shall be governed by and construed in accordance with the substantive laws of the state of Georgia.

18. Waiver

No provision of this Agreement may be waived except in a writing duly signed by the party waiving such provision. Either party's action in not enforcing a breach of this Agreement shall not prevent such party from enforcing this Agreement as to such breach or any other breach.

19. Modification

Except as provided in Section 14, any additions, changes or modifications to this Agreement must be in writing, signed by Employee and the president of the Company. The President of the Company is the only the Company official with authority to make any additions, changes or modifications to this Agreement, enter into any contrary agreement, or to provide the Company's express written consent as described in Paragraph 4 of this Agreement.

20. Counterparts

This Agreement may be executed in any number of original counterparts or by facsimile or e-mail, each of which when executed and delivered will be deemed to be an original and all of which taken together will constitute but one and the same instrument. One or more counterparts of this Agreement may be delivered by facsimile or other electronic means, with the intention that delivery by such means shall have the same effect as delivery of an original counterpart hereof.

**Employee:**

Jeffrey Klein
Signature

Jeffrey Klein
Printed Name

2/24/2021
Date

**BakeMark USA, LLC:**

Robert Braden
Signature

Robert Braden
Printed Name

Manager, Human Resources
Title

2/24/2021
Date

# EXHIBIT C

DocuSign Envelope ID: A7BA0A54-4E3E-4F91-9FA7-9D3CB409A2D4

**BakeMark**

## EMPLOYEE NON-SOLICITATION, INVENTIONS, & CONFIDENTIALITY AGREEMENT

This Employee Non-Solicitation, Inventions & Confidentiality Agreement (this "Agreement") is entered into between BakeMark USA LLC (the "Company") and ___Roy Bahner___ ("Employee");

**WHEREAS**, Employee is employed by, or is about to be employed by the Company;

**WHEREAS**, the Company and Employee agree that through Employee's employment with the Company, Employee will receive (or has received) significant training and will gain (or has gained) significant knowledge and expertise in specific areas related to the Company's business of manufacturing and marketing ready-to-use icings, fillings, mixes and bases, frozen dough and batters, donut glazes, icing bases, icing and glaze stabilizers, cake frosting and related products ("Baking Products"), which training, knowledge and expertise Employee would not have otherwise obtained;

**WHEREAS**, Employee and the Company further agree that through Employee's employment with the Company, Employee will be placed in a position of trust and confidence with the Company and that the Company will provide (or has provided) Employee with confidential and proprietary information concerning its business, products, suppliers, manufacturers, pricing, customers, and employees, and will entrust Employee with business relationships and good will of great value to the Company;

**WHEREAS**, the Company and Employee also agree that through Employee's employment with the Company, Employee may conceive or produce (or has conceived or produced) inventions relating to the Company's business and may learn or develop Confidential Information, as defined below, the disclosure of which to any third party would cause irreparable harm to the Company;

**WHEREAS**, the Company and Employee also agree that through Employee's employment with the Company, Employee may use confidential customer information provided by the Company or developed by Employee; and

**WHEREAS**, in light of the foregoing, Employee and the Company agree that the following restrictions are necessary and reasonable for the protection of the Company's legitimate business interests, including its investment in Employee's training, its good will, its confidential information and customer relationships, and the continued success of its business.

**NOW, THEREFORE**, in consideration of Employee's employment or continued employment with the Company, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Employee and the Company agree as follows.

1.   No Restrictions on Employee

Employee warrants and represents that Employee is not subject to any non-competition/non-solicitation restriction or other restrictive covenant that would restrict Employee's ability to enter into this Agreement or perform the duties required by the Company in conjunction with Employee's employment. Employee will not disclose to the Company, or use on its behalf, any confidential or proprietary information of a former employer or other third party if an obligation exists to protect the confidentiality of such information.

2.   Notification to Third Parties

Employee acknowledges and agrees that the Company may notify any future or prospective employer of Employee, any client of the Company, or any other appropriate third party of the existence and the terms of this Agreement.

3.   Independent Enforceability

Each of the rights and remedies set forth in this Agreement will be independent of the others, and will be in addition to, and not in lieu of, any other rights and remedies available to the Company under law or equity or applicable to Employee under any other the Company policy or guideline.

4.   Disclosure of Confidential Information

Employee shall hold Confidential Information (as defined below) in the strictest confidence and shall not, without the prior written authorization of an authorized the Company officer, or as required by law, disclose Confidential Information in any manner to any person, or use Confidential Information in any way, other than in the furtherance of Employee's duties during his/her employment with the Company. The foregoing obligation shall apply at all times during employment with the Company and for a period of five (5) years thereafter, unless such information qualifies as a trade secret, in which case the foregoing obligation shall continue for so long as the trade secret remains protected under applicable law. Employee will not copy, duplicate or reproduce Confidential Information for any purpose other than for use by or on behalf of the Company and will not improperly take or retain such information without the Company's prior written consent. Employee will comply with all Company policies, procedures and practices pertaining to such Confidential Information and take all commercially reasonable steps to protect and maintain the secrecy thereof.

(a)   "Confidential Information," as used herein, means trade secrets (as defined by applicable law) or other confidential and proprietary information relating to the Company's customers, manufacturing, products, services, pricing and sales, research, business, practices, procedures or Baking Products not generally known by or available to the public that Employee becomes privy to by virtue of employment with the Company, including but not limited to the following:

(i)   collected or compiled information about the Company's customers, including names,

DocuSign Envelope ID: A7BA0A54-CE3E-4F91-9FA7-6D3CB409A2D4

addresses, telephone numbers, contact persons and other identifying information with respect to the needs and requirements for customers; information dealing with the nature of customers' accounts, including the dates on which agreements between the Company and such customers will end and/or be subject to renewal; and rate and price information and history relating to products provided by the Company to its customers;

(ii)      information about the Company's internal methods of operation and manufacturing, including information relating to the machinery, equipment, processes, product mix and formulas by which the Company develops and manufactures its Baking Products; and

(iii)      information about the Company's sales, finances and business, including business and marketing plans, practices and strategies; information with respect to the Company's suppliers and the availability of materials and supplies used in its business; and non-published financial information relating to the Company's income, budgeting, cost structures, expenses, profits and general financial standing.

Confidential Information does not include any information that is or shall become generally known in the trade through no fault of Employee; any information Employee receives in good faith from a third party who has the right to disclose such information and who has not received such information, either directly or indirectly, from the Company; or any information that was within Employee's legitimate possession prior to his/her employment from the Company.

Confidential Information disclosed by the Company or any of its affiliates to Employee will remain the exclusive property of the Company or its affiliates, and all rights to Confidential Information will be held in trust by Employee for the benefit of the Company. Neither this Agreement nor the disclosure or revelation of Confidential Information will constitute or be construed as granting to Employee, by implication or otherwise, any right, title or license under any patent, patent application, trademark, copyright or any know-how to which the Company or any of its affiliates now has or hereafter may obtain, or as imposing on Employee any obligation, except as specified in this Agreement. The Company does not make any representations or warranties regarding the infringement of any patents, trademarks or copyrights held by any third party.

Notwithstanding anything herein to the contrary, Employee may not be held criminally or civilly liable under any federal or state trade secrets law for any disclosure of a trade secret that is (i) made in confidence to a federal, state or local governmental, regulatory or administrative agency, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law, or (ii) set forth in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and provided Employee does not otherwise disclose such information except pursuant to court order. Nothing herein is intended, or should be construed, to affect the immunities created by the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq., or other applicable law.

5.      Return of Materials

Upon termination of Employee's employment with the Company, whether with or without cause, and whether initiated by Employee or the Company ("Termination"), or at any other time at the Company's request, Employee shall deliver to the Company all of its materials, documents, plans, records, notes, drawings, or papers and any copies thereof (whether electronic or hard copy) which may be in Employee's possession or under Employee's control pertaining to the Company's business, including in particular all notes or records Employee has relating to the Company customers, prospective customers or Confidential Information. Immediately upon Termination, Employee will not access, download, delete, erase or transmit any information stored on any Company server, network, web-based data storage account or service, computer, e-mail account, intranet, telephone/voicemail system, smartphone or electronic storage device without the Company's prior written consent, and will refrain from accessing any Confidential Information stored on any personal computer, e-mail account, tablet, smartphone, electronic storage device or web-based data storage account or service. Employee will inform the Company of all such media and, upon direction from the Company, will permanently delete and erase any Confidential Information stored on such media and/or allow the Company or its designee to access and forensically examine such media to ensure that all such information has been permanently deleted and erased. Upon request from the Company, Employee shall certify in writing that he or she has fully complied with the obligations set forth in this Section 5.

6.      Customer      Non-Solicitation/No-Service/Non-Interference

Employee agrees that during employment with the Company and for a period of one (1) year after Termination, Employee will not directly or by assisting others: (a) solicit, call upon or contact any Restricted Customers (as defined below) for the purpose of providing products or services that are competitive with Baking Products and related services offered or provided by the Company within two (2) years prior to Termination ("Competitive Products or Services"); (b) contract with, sell to or perform services for or on behalf of any Restricted Customers in connection with Competitive Products or Services; or (c) divert, unlawfully interfere with, or attempt to divert or unlawfully interfere with, the Company's business relationship with any Restricted Customers.      The term "Restricted Customers" means existing customers with whom the Company has conducted business within two (2) years prior to Termination and with whom during such time Employee had business-related contact or was privy to Confidential Information.

Notwithstanding anything herein to the contrary: (y) if Employee is employed by the Company in California or North Dakota, or in Colorado and is not executive or management personnel or an officer or employee who constitutes professional staff to executive or management personnel, the foregoing restriction shall not apply; and (z) if Employee is employed by the Company in Nevada or Oklahoma, subsection (b) shall not apply.

7.      Employee Non-Solicitation/No-Hire

Employee agrees that during employment with the Company and for a period of one (1) year after Termination, Employee will not directly or by assisting others: (a) solicit, induce or encourage any Restricted Employees (as defined below) to terminate their employment or other association with the Company or to work for a Competing Business; or (b) hire,

DocuSign Envelope ID: A7BA0A54-CE3E-4F91-9FA7-6D3CB409A2D4

caused to be hired or attempt to hire any Restricted Employees on behalf of a Competing Business. The term "Restricted Employees" means each and every person employed or otherwise engaged by the Company, including independent contractors, within two (2) years prior to Termination and with whom during such time Employee had supervisory responsibility, work-related contact or was privy to personnel information relating to such persons' compensation, benefits, job duties or performance evaluations. Notwithstanding the foregoing, "Restricted Employees" does not include persons who have not been employed or otherwise engaged by the Company for more than six (6) months at the time of any such solicitation, inducement, encouragement, hiring or attempted hiring. The term "Competing Business" means any individual (including Employee), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is directly engaged in whole or in relevant part in any business or enterprise which is competitive with the business conducted by the Company, including the manufacturing, marketing and sale of Baking Products.

Notwithstanding anything herein to the contrary: (y) if Employee is employed by the Company in California or North Dakota, or in Colorado and is not executive or management personnel or an officer or employee who constitutes professional staff to executive or management personnel, the foregoing restriction shall not apply; and (z) if Employee is employed by the Company in Oklahoma, subsection (b) shall not apply.

8.     Tolling of Restrictive Periods

If Employee breaches any of the restrictions set forth in Sections 6 or 7 and the Company commences a legal proceeding in connection therewith, the time period applicable to each such restriction shall be tolled and extended for a period of time equal to the period of time during which Employee is determined by a court of competent jurisdiction to be in non-compliance or breach (not to exceed twelve (12) months) commencing on the date of such determination.

9.     Inventions

(a)     Ownership of Inventions.  Employee agrees that all Inventions (as defined below) will be the sole and exclusive property of the Company.  Employee will, with respect to any Invention, (i) keep current, accurate, and complete records, which will belong to the Company and be kept and stored on the Company's premises; (ii) promptly and fully disclose the existence and describe the nature of the Invention to the Company in writing (and without request); (iii) assign (and Employee hereby assigns) to the Company all of Employee's right, title and interest in and to the Invention, any applications Employee makes for patents or copyrights in any country, and any patents or copyrights granted to Employee in any country; and (iv) acknowledge and deliver promptly to the Company any written instruments, and perform any other acts necessary in the Company's opinion to preserve property rights in the Invention against forfeiture, abandonment or loss and to obtain and maintain letters patent and/or copyrights on the Invention and to vest the entire right and title to the Invention in the Company.  Employee agrees to perform promptly (without charge to the Company but at the expense of the Company) all acts as may be necessary in the Company's opinion to preserve all patents and/or copyrights granted upon the Inventions.

(b)     Notice.  Employee is hereby notified that, in accordance with California Labor Code § 2870, this Agreement does not apply to any Inventions that Employee developed entirely on Employee's own time without using the Company's equipment, supplies, facility, or trade secret information except for those inventions that either (1) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company; or (2) result from any work performed by Employee for the Company.

(c)     Separate Assignment Agreement.  The terms of the foregoing assignment as to any Invention may be subject to a separate assignment agreement between Employee and the Company.  The existence of such an assignment agreement shall have no effect on the assignment pursuant to this Agreement of any other Invention.

(d)     Works Made for Hire.  To the extent that any Invention qualifies as "work made for hire" as defined in 17 U.S.C. § 101 (1976), as amended, such Invention will constitute "work made for hire" and, as such, will be the exclusive property of the Company.

(e)     Presumption.  In the event of any dispute, arbitration or litigation concerning whether an invention, discovery, improvement or idea made or conceived by Employee is the property of the Company, such invention, discovery, improvement or idea will be presumed the property of the Company and Employee will bear the burden of establishing otherwise.

(f)     "Inventions," as used herein, means any inventions, discoveries, improvements and ideas, whether or not in writing or reduced to practice and whether or not patentable or copyrightable, made, authored or conceived by Employee in connection with his/her employment with the Company, whether by Employee's individual efforts or in connection with the efforts of others.

10.     Reasonableness of Restrictions

Employee stipulates that the restrictions and obligations in this Agreement are reasonable and necessary for the protection of the Company's legitimate business interests, do not prohibit Employee from using general skills and know-how acquired during or prior to employment with the Company, and do not preclude Employee from earning a livelihood, working in his or her chosen field or otherwise impose any undue hardship.

11.     Right to Injunction

The parties recognize that the Company will suffer irreparable damage if Employee violates or threatens to violate the terms of Sections 4, 5, 6, 7 and 9, and that such damage would be difficult to quantify, and it is therefore agreed that, in the event of a breach or threatened breach of said Sections, the Company shall be entitled to injunctive relief, in addition to all other legal and equitable remedies available to it, without the necessity of posting a bond or other security.  The prevailing party in any such action shall be entitled to recover its reasonable costs and attorneys' fees.

12.     Protected Activities

DocuSign Envelope ID: A78A6A54-CE3E-4F51-8FA7-8D5CB409A2D4

Nothing in this Agreement prohibits Employee (with or without notice to the Company) from reporting allegations to, responding to compulsory legal process issued from, testifying before or otherwise participating in an investigation or proceeding conducted by a federal, state or local government body, administrative agency or judicial authority concerning an unlawful employment practice, illegal conduct or a suspected violation of law, including, but not limited to, acts and omissions prohibited by Title VII of the Civil Rights Act of 1964, the Securities Exchange Act of 1934 or other comparable state and federal laws.  Nor does anything in this Agreement prohibit Employee from making truthful statements and disclosures regarding alleged unlawful discrimination, harassment and/or retaliation or from discussing the terms, wages and working conditions of employment with the Company.

13.    Entire Agreement

This Agreement constitutes the entire agreement between Employee and the Company regarding the subject matter hereof, and replaces and supersedes all prior or contemporaneous communications, agreements or representations governing the same subject matter; provided, however, that this Agreement shall supplement to the extent possible any related Company policy or guideline contained in the Company's Employee Handbook or Policy Manual.  In the event of any conflict between this Agreement and any Company policy, this Agreement shall control and govern.

14.    Interpretation; Severability of Invalid Provisions

All rights and restrictions contained in this Agreement may be exercised and shall be applicable and binding only to the extent that they do not violate any applicable laws, and are intended to be limited to the extent necessary so that they will not render this Agreement illegal, invalid or unenforceable.  If any term of this Agreement shall be held to be illegal, invalid or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect.  If a court of competent jurisdiction holds any provision to be overbroad or unreasonable as written, the parties agree that the court shall reasonably alter such provision to the extent necessary to make the provision enforceable under applicable law, and enforce the provision as amended.

15.    Survival

The restrictions and obligations in Sections 2, 4, 5, 6, 7 and 9 shall survive the termination of this Agreement and the termination of Employee's employment with the Company.

16.    Agreement Binding

This Agreement shall inure to the benefit of the Company and its successor, assignees, and designees and shall be binding upon Employee and his/her heirs, executors, administrators and personal representatives.

17.    Choice of Law

This Agreement shall be governed by and construed in accordance with the substantive laws of the state of Georgia.

18.    Waiver

No provision of this Agreement may be waived except in a writing duly signed by the party waiving such provision.  Either party's action in not enforcing a breach of this Agreement shall not prevent such party from enforcing this Agreement as to such breach or any other breach.

19.    Modification

Except as provided in Section 14, any additions, changes or modifications to this Agreement must be in writing, signed by Employee and the president of the Company.  The President of the Company is the only the Company official with authority to make any additions, changes or modifications to this Agreement, enter into any contrary agreement, or to provide the Company's express written consent as described in Paragraph 4 of this Agreement.

20.    Counterparts

This Agreement may be executed in any number of original counterparts or by facsimile or e-mail, each of which when executed and delivered will be deemed to be an original and all of which taken together will constitute but one and the same instrument.  One or more counterparts of this Agreement may be delivered by facsimile or other electronic means, with the intention that delivery by such means shall have the same effect as delivery of an original counterpart hereof.

**Employee:**

Roy Bahner
Signature

Roy Bahner
Printed Name

2/19/2021
Date

**BakeMark USA, LLC:**

Robert Braden
Signature

Robert Braden
Printed Name

Manager, Human Resources
Title

2/19/2021
Date